May it please the court, my name is Emmanuel Samonte Tipon. I represent the defendant appellant in this case, Mr. Romelius Ramiro. Thank you for the opportunity to speak before this court. We are here to address two principal issues that the court asked us to address in granting the certificate of appealability. The first one is whether the defendant's trial attorney provided ineffective assistance of counsel when he failed to advise the defendant that his guilty plea would result in his removal. And the second issue is whether the defendant's trial attorney rendered ineffective assistance of counsel when he failed to advise the defendant that after serving his sentence he would still be subject to mandatory detention while awaiting the conclusion of his removal proceedings. This case, Your Honor, involves a person who was with a group of his acquaintances and when one of them said that somebody wants to buy drugs, he didn't want to get involved so he threw away a pouch which is said to contain drugs and this pouch was picked up by another of his friends or associates and given to the first one who said somebody was going to buy drugs. And apparently this was turned over to the buyer who turned out to be an undercover agent. He was charged with distributing meth and at the first hearing he was without counsel and he pleaded not guilty, which probably was his instinct. So the court appointed counsel for him and after they talked with the defendant, he advised him to plead guilty, telling him that if he lost the case he would be sentenced to 20 to 40 years. And when the defendant asked about the possibility of his being deported, counsel told him that you may be deported. He did not tell him that you will be deported. Counsel, at some point in the record it indicates that he said he more than likely would be deported. Do you contest that? If he said that, Your Honor, it is still the same result as saying may because it did not import the certainty of the defendant's being deported because the defendant was charged with distributing meth, which is an aggravated felony, and there is no relief available for him. But nothing is certain in the future. It's all predictions. We all think certain things will happen in the future. We think we're going to hold court tomorrow, but things happen. Mistakes get made. There's no way that the lawyer can say for sure. Why isn't it more than likely? Is there any case, including Padilla, that requires any more than that kind of warning, that requires a statement of certainty? I have not come across any such case, Your Honor. But under the circumstances of this case, where the certainty of being denied relief like cancellation of removal was certain, counsel should have expressed the deportation consequence in more certain terms. From a lay person's perspective, I think that's right. People want to have lawyers tell them this is the law. But as you know, as we lawyers know, lawyers are very reluctant to make categorical statements. We're taught from law school that nothing is certain. Law can change and all that. So what the lawyer said, which I think he said on the record, he says on the record, more likely than not, that's about as certain as a lawyer is likely to get. I mean, I know very few lawyers would be willing to say categorically, your client comes and says, you know, what are the consequences? Well, categorically this will happen. It's just not in our blood, I don't think. Well, many lawyers would be reluctant to say that, Your Honor, if they're not familiar with immigration law. Because in this case, apparently the counsel for the defendant was not very familiar with immigration law. As a matter of fact, the district court suggested to him when he was trying to negotiate a sentence of less than one year that maybe they should have a recess so that he could consult with somebody. So the district court expressed concern that the trial attorney was not giving the correct advice regarding the certainty of the defendants being deported. If we agreed with that part of your argument, how was he prejudiced? It seems that he made a decision after all of his co-defendants decided to plead and then testify against him. Isn't that correct? Well, that's what the government claims, Your Honor, that he decided to plead guilty because the co-defendants were going to testify against him. But trial counsel did not explore the scope of their testimony. He did not interview them and he did not determine what they were going to say against him. So that's a bigger allegation of the government. Counsel, can I ask you this? To show prejudice, do you need to show that if he had gone to trial, he actually would have been acquitted? Is that what you think you need to show? No, Your Honor. What we are trying to suggest is that if he had gone to trial, considering the circumstances of the case where he threw away a pouch, a reasonable juror could say, well, he was not distributing. He was discarding. Let me just be clear. I'm trying to help here. I thought that to show prejudice, all you needed to show was that your client, in fact, would have exercised his right to go to trial, even if there were a 99 percent likelihood that he would have been convicted anyway. That it would be enough to show prejudice just to say, had I been given non-misleading advice, I would have exercised my right to go to trial, period, and then you win. Am I wrong on that? Well, to put it succinctly, Your Honor, I believe that is the point that the defendant was telling me when he wanted to have his conviction and sentence set aside, that he wanted to go to trial, take his chances, and he felt that he had a reasonable chance of... Yes, Your Honor. He would have exercised his right. But it was not a trivial deal he got. And the question is, is she likely to have walked away from a deal like that just because she was told, when you're done, when you're out of prison, you're going to be sent back to the Philippines, right? You're going to be sent back to your home country. Well, Your Honor, if the defendant were a United States citizen, I think he got a fairly good deal. But he's not a United States citizen, and his primary concern at that point was whether he would stay in the United States. You said that he got a good deal. I guess maybe I'm confused on the record. I thought he got basically no deal at all. All I see him getting is the two-level reduction for acceptance of responsibility, which had a marginal impact on his guideline range, right? I thought that he was under a 12 to 16 or 12 to 18-month range pleading guilty. Had he gone to trial and been convicted, he would have lost the two-level reduction for acceptance, and he might have been in the 18 to 24-month range, no? Yes, Your Honor, but not the 20 to 40 years that trial attorney told him he would get if he lost the case. But I'm saying as a practical matter, he was never looking at 20 to 40 years, right? Under the guidelines, his range was much lower, no? He did not know that, Your Honor. He just relied on his attorney, 20 to 40 years, so he got scared. Might as well... You don't have a claim here that the lawyer advised him badly about the consequences, so the question is, given the advice his lawyer gave him, which we don't know, may or may not have been correct, would he have walked away from that deal if he had just known he'd be deported? Well, if he knew that he was certain to be deported, I think he would have accepted the deal. He would have gone to trial, Your Honor. Okay, thank you. We're almost out of time. We'll go to the government. Good morning. My name is Michael Kawahara, Assistant United States Attorney, representing the United States of America. In answer to your question, the two reserve questions that, as part of the Certificate of Appealability, there is no case law that would hold, as the defendant claims here, that a guarantee or something close to that would hold that the defendant would not be deported. So, the question is, given the advice he gave me, would he have walked away from that deal? Well, there's no case law that would hold that the defendant would not be deported. So, the question is, given the advice he gave me, would he have walked away from that deal? That's correct. Or affirmatively misled, I believe is the statute. Okay, so I'm trying to figure out if I want to plead guilty, and basically the offense to which I'm going to plead guilty makes it mandatory that I'll be removed from the country, right? I mean, that's the situation we're faced with. There's not going to be any discretion that the immigration judge exercises as to whether you get to stay or not, right? That's the scenario we're dealing with? That's what the statute says. So, why isn't it misleading then to advise the client that, you know what, if you plead guilty, and I can get the sentence down to around 12 months, that's going to put you in a better posture when you go before the immigration judge, and he or she might, in fact, exercise some leniency and allow you to stay. Why isn't that misleading? Because there are still – you still have to go through a procedure, which is beyond the control of both this defense counsel and the court of going before the immigration judge, having to go through a hearing, and a separate order must be issued by that immigration judge. If the lawyer had advised him, as Judge Watts would suggest, let's say he sat him down and said, look, I've got this deal for you, and when you get out, you're going to be in much better posture before the immigration judge as far as deportation is concerned. If the lawyer had affirmatively said that to him, then that would be a Kwong error, wouldn't it? That would be closer to an affirmative misrepresentation. I do not think he would be an affirmative statement. That's correct. That's correct. About the likely consequences. Correct. The issue here is to what extent are you going to – will this court or will the courts require a defense counsel? To what extent is what actually happened different from what Judge Watts posited? I think this – I think the purport of the question was, isn't that implicitly what he was saying when he said – when he said – I'm reading the sentencing memorandum that he submitted to the district judge, and he says explicitly that please sentence him just to 12 months even, not even 12 months in a day. That's the minimum. That's statutory minimum. And we hope such a sentence would be a mitigating factor as to the issue of deportation. Well, that was just completely wrong. It could not have been a mitigating factor. It's – again, it's a question of the judge, an immigration judge, would have – there are certain defenses that are still preserved. There is the Convention Against Torture, things like that. There are aspects like that. How can you as defense counsel guarantee a particular result when there are certain subsequent steps beyond your control that must be accomplished before anyone is deported? Well, a lot of the dialogue, as I recall, had to do with 12 versus 12 plus a day. That's correct. That's in terms of the – What difference did that – why would he not – what difference did it make going before the IJ whether it was 12 or 12 plus a day? I don't think in that particular context after he pled guilty there was not much of a difference. Right. It would have made a difference for his sentencing – I mean his time served credit. So that was a Bureau of Prisons issue. So why would he be fighting something that could benefit his counsel if he somehow thought this was all going to make a difference before the immigration judge? It made no difference as far as the immigration judge, 12 months or 12 and a day. It does seem to suggest that the attorney did not understand or had some misimpression about what the immigration judge could do. I think you have a situation where Mr. Arakaki recognized the chances of his client defeating removal were very slim to begin with. But he was going to try and provide anything he could that could possibly be of assistance or help in that immigration proceeding. That begs the question. I understand that. But what's the difference for immigration purposes to plead to something that wouldn't benefit him if he went into prison? I think that – It wouldn't affect him, would not have affected his posture materially before the IJ. Well, the question I think more importantly, and it was raised earlier, I don't think he's looking at just merely a 12 to 16-year sentencing range. What is he looking at if he goes to trial? If he went to trial. And I think I covered this in my appellate brief, but I just wanted to summarize it. It's speculated, well, he would have testified falsely and he would have gotten hit with an upward adjustment for perjury. I don't think you get that. All you gave up in the plea agreement was he was going to get the two levels off for acceptance. What else did you give up in the plea agreement? The second charge. The second charge was dropped. Which had no impact on the sentencing guidelines range because those drugs were added in his relevant conduct. So you gave up nothing other than the two levels that he was not going to get if he'd gone to trial. And I look at this sentencing guidelines range. The difference is between 12 and 18 and what, 18 to 24? It's a marginal difference. And this guy in sentencing was thinking seriously about sitting in prison for 54 extra days just because he thought it would put him in a better posture before the immigration judge. Well, you're making the assumption, I think, Your Honor, that deportation was paramount in his mind or that he thought he could defeat deportation. I don't think that is the case. I don't think that is the case. Not with what was said first at the change of plea hearing where Mr. Arutaki specifically said that. And then at the sentencing hearing, there was considerable talk about the inevitability of his deportation. And what I see in the record here is that this defendant recognized that he was deportable and that was not really paramount in his mind, contrary to what the defense is saying here. Let's go back to the sentencing. His lawyer comes out and says, contrary to all of his best interest, Your Honor, please sentence him to 12 months even. And the judge says, wait a minute. I'm not inclined to do that. He's going to not get any good time credits. Don't you want me to give him 12 months and a day so that he can get out 54 days earlier? And the lawyer says, no, no, no, Your Honor. We want it to be 12 months exactly because we think that's going to put him in a better posture before the immigration judge. And then the judge insists that the defendant go consult with his dad. Do you really want to stay in prison for 54 extra days because I don't think it's going to make a difference? And the defendant, actually there needed to be a recess so he could ponder that possibility. So obviously his lawyer told him that you're going to go before an immigration judge and that judge is going to have some discretion about whether to let you stay, right? I mean, what other inference can we draw from this record? Not with what I would suggest is not the case because, first of all, you have what probation indicated. Probation was given the opportunity. There was that great discussion. There was a little bit of confusion and probation. The probation officer indicated from her discussions with Immigration Customs Enforcement that there was an inevitability, there was a zero tolerance policy concerning this. That ICE has a zero tolerance. Correct. So that means certainly that he was going to face deportation. That was a certainty. But everybody, including the district judge here, suggested that, well, but you're still going to have to go before an immigration judge and that person is ultimately the person who gets to decide whether you're going to stay or go. But, Your Honor, that is a correct statement too because notwithstanding the statutory language, you cannot automatically deport anyone, even for an aggravated felony, without going through that mandatory procedure, that immigration due process, without an immigration judge actually signing an order saying that you shall be removed. It is not self-executing. So what you're suggesting, you invoked a convention against torture or fear of future persecution. Are you suggesting that there was something in Mr. Romero's background that made that a viable possibility? I did not know, Your Honor. I'm just suggesting that, notwithstanding the statutory language, that it's not absolutely certain, it is not guaranteed that that will be the result of that. But it would have to be, if you're agreeing that it was zero tolerance and that there was mandatory in the statute, but there's wiggle room because the I.J. has the last word. The I.J. doesn't just get to create a last word. Government will take them up, as you know, and appeal to the BIA and get it turned around. Both sides have that opportunity, yes, sir. Yes. So the question then is what conceivably could have been in the attorney's mind that a 12-month, as opposed to 12-month-and-a-day sentence, would have a material impact on Mr. Romero in going before the I.J.? It can't be the day. So what conceivably could he have had in mind if he understood the immigration laws? I don't think he could have done anything differently because it doesn't make a difference. And even the defendant said so because he – remember, there was that discussion. Judge Malway wanted the defendant to understand what they were talking about. And the defendant recognized that once his sentence was completed, he was going to go into administrative hold for the removal procedure. So he recognized there was no difference whether he got a 12-month sentence with no good time or a sentence of 12 months and one day. And I think that was underlying this whole particular matter to begin with. I realize what you are saying, but in a way, it's somewhat academic here because of the detention that would follow as a result, regardless of whether he was – whether he pled guilty or whether he was convicted. It was – it followed as a matter of course that the law required that he be detained. Thank you. You're out of time. If you'd like a minute for a bottle, you may take it. Your Honor, with respect to the question that was raised whether any lawyer would say you will be deported, I also handle cases on immigration, and when the person seeking relief comes to me and he has no relief at all, there's no cancellation of removal, and there's no convention against torture or asylum, I have no hesitation in telling this person, you will be deported. You don't have a chance. And what they do is they go shopping around for lawyers who will tell them a different story. But because I know that when a person is charged with an aggravated felony, there's no relief like cancellation of removal. And in fact, Mr. Ramiro, in his removal proceedings, was denied. Your position is that the defense lawyer, the criminal defense lawyer, has to do a full bore analysis of the defendant's, the client's chances of success in immigration. Because, you know, convention against torture involves all sorts of other facts that are not apparent on the record, for example. So your position is that our cases, even pre-Padilla, required the defense lawyer to be an immigration lawyer too. Not necessarily, Your Honor, but if he does not know immigration law, then he should consult with an immigration attorney who knows the ramifications of immigration law, like what Judge Fletcher suggested in the Kwan case. Or he could tell the person, you consult an immigration lawyer as to the ramifications of your case. Okay, thank you. Thank you, Your Honor. Case is argued with tantamount.
judges: Kozinski, Fisher, Watford